UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**26-CR-80123-CANNON/McCabe**
Case No. _____

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 2
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

vs.

JASON FINKELSTEIN,

          **Defendant.**

_____/

FILED BY_____ **BM** _____D.C.

**Jun 16, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times material to this Indictment:

### Commercial Insurance

1.      Aetna, Blue Cross and Blue Shield Texas ("BCBS TX"), Capital District, Cigna, UnitedHealth Group ("United"), and University of Pittsburgh Medical Center Health Plan ("UPMC") were private health care companies that offered various individual and family insurance plans. Aetna, BCBS TX, Capital District, Cigna, United, and UPMC (collectively, "Commercial Insurance Plans") offered health care coverage directly to consumers through employers. They also offered managed health care plans to federal employees. The Commercial Insurance Plans covered medical costs of diagnostic cardiovascular testing in accordance with their policies and state and federal law, including requirements that such services be medically

necessary. The Commercial Insurance Plans were "health care benefit program[s]," as defined in Title 18, United States Code, Section 24(b).

## The Federal Employees Health Benefit Program

2.      The Federal Employees Health Benefit Program ("FEHBP") was a federally funded health benefit program provided by the federal government for federal employees, retirees, and their eligible spouses and dependents. The Office of Personnel Management administered the FEHBP. Health plans offered by FEHBP were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b).

## Veterans Health Administration

3.      The Veterans Health Administration ("VHA") was a health care program managed by the United States Department of Veterans Affairs ("VA"). VHA provided health care services to eligible veterans through VA medical centers, outpatient clinics, and community-based providers. Health plans offered by VHA were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b).

## The Medicaid Program

4.      The Medicaid Program ("Medicaid") was a partnership between states and the federal government that provided health care benefits to certain low-income individuals and families. The benefits available under Medicaid were governed by federal and state statutes and regulations. Medicaid was administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the United States Department of Health and Human Services ("HHS"),

2

and individual state agencies. Individuals who received benefits under Medicaid were commonly referred to as Medicaid "recipients."

5.    Medicaid reimbursed providers for medically reasonable and necessary items and services rendered to recipients. To receive payment from Medicaid, providers submitted or caused the submission of claims to Medicaid, either directly or through a Medicaid Managed Care Organization ("MCO").

6.    Medicaid was funded with both federal and state money, and was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

**Diagnostic Cardiovascular Testing**

7.    Diagnostic cardiovascular testing was covered by insurance under certain circumstances to diagnose or manage signs or symptoms of cardiac disease. These included electrocardiograms ("EKGs"), echocardiograms ("ECHOs"), and vascular ultrasound imaging of the carotid artery, abdominal aorta, legs, and behind the knees (collectively, "diagnostic cardiovascular testing" or "diagnostic cardiovascular tests"). In the absence of specific signs or symptoms of disease, these diagnostic cardiovascular tests were typically not covered by insurance, except in limited circumstances.

8.    Insurance companies, including federal health care benefit programs, relied on clinical guidelines to make determinations of medical necessity and benefit coverage for diagnostic cardiovascular tests. These guidelines provided objective and evidence-based criteria for medical necessity determinations and were designed to assist health care providers in making the most appropriate treatment decision for patients with specific clinical conditions. For example, the guidelines adopted by BCBS TX required that prior to conducting diagnostic cardiovascular testing, "it is essential that the clinician confirm [a] diagnosis" based on a "complete evaluation of

3

the patient," including "history and physical examination[,] . . . review of relevant laboratory studies, diagnostic testing, and response to prior therapeutic intervention."

9.    An EKG used temporary electrodes on the chest and limbs to monitor, track, and document the electrical activity of the heart throughout the cardiac cycle of contraction (depolarization) and relaxation (repolarization). The changes in electrical potential during the cardiac cycle were detected at the body surface and recorded on graph paper. The recording was reviewed by a physician who provided an interpretation and written report.

10.    An ECHO used ultrasound to create pictures of the heart's valves and chambers to check the structure and function of the heart and to diagnose and manage heart disease.

11.    Vascular ultrasound imaging of the head, neck, chest, abdomen, or extremities were used to diagnose or manage certain vascular conditions that may have obstructed or otherwise negatively affected arterial or venous blood flow.

12.    The Commercial Insurance Plans, FEHBP, VHA, and Medicaid required a medical necessity determination to be made before reimbursing a health care provider for EKG, ECHO, and vascular ultrasound imaging tests.  The Commercial Insurance Plans, FEHBP, VHA, and Medicaid did not reimburse a health care provider for EKG, ECHO, or vascular ultrasound imaging tests conducted as "screening tests", that is tests conducted with no medical necessity determination made.

### The Defendant, Relevant Entities, and Relevant Individuals

13.    **JASON FINKELSTEIN** was a resident of Tarrant County, Texas, in the Northern District of Texas. **FINKELSTEIN** graduated from St. George's University School of Medicine, in Grenada, West Indies in 1999. **FINKELSTEIN** completed an internal medicine residency at Hahnemann University in Philadelphia, Pennsylvania in 2002. **FINKELSTEIN** completed a

4

cardiology fellowship at Tulane University Health Science Center in New Orleans, Louisiana in 2005, and completed an interventional cardiology fellowship at St. Vincent's Hospital in Indianapolis, Indiana in 2006. **FINKELSTEIN** was certified by the American Board of Internal Medicine, with a specialty in Internal Medicine, and subspecialties in Cardiovascular Disease and Interventional Cardiology. **FINKELSTEIN** was licensed in 48 states.

14.    Co-Conspirator 1 was a resident of Palm Beach County, in the Southern District of Florida.

15.    Co-Conspirator 2 was a resident of Broward County, in the Southern District of Florida.

16.    Company 1 was a company formed under the laws of Florida, with its principal place of business in Boca Raton, Florida, in the Southern District of Florida. **JASON FINKELSTEIN** was the Medical Director of Company 1. Co-Conspirator 1 was the owner, operator, and Managing Partner of Company 1. Co-Conspirator 2 was the Director of Operations of Company 1. Company 1 used a medical billing software company located outside the State of Florida ("Medical Billing Software Company 1").

17.    Cardiovascular Testing Services PA ("Cardiovascular Testing") was a professional association formed under the laws of Texas, with its principal place of business in Tarrant County, in the Northern District of Texas. **JASON FINKELSTEIN** was the owner of Cardiovascular Testing.

18.    Cardiovascular Healthcare Associates PA ("Cardiovascular Healthcare") was a professional association formed under the laws of Texas, with its principal place of business in Tarrant County, in the Northern District of Texas. **JASON FINKELSTEIN** was the owner of Cardiovascular Healthcare.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around January 2019, and continuing through in or around December 2025, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### JASON FINKELSTEIN,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with Co-Conspirator 1, Co-Conspirator 2, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.     to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, the Commercial Insurance Plans, FEHBP, VHA, and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.     to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in

6

interstate commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

3.     It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) obtaining patient referrals for medically unnecessary diagnostic cardiovascular testing through marketing tactics designed to prey on fears that student athletes could die from sudden cardiac arrest and through the payment of kickbacks and bribes to athletic directors and others; (b) employing sonographers who lacked the requisite credentials to travel to school campuses to conduct the same panel of diagnostic cardiovascular tests on student athletes without any clinical examination or assessment being conducted by a doctor; (c) assigning false diagnosis codes to the students' completed medical questionnaires so that Company 1's billers could then use them to bill claims to health care benefit programs; (d) signing off on cardiovascular diagnostic tests as normal without conducting a meaningful medical review of the tests; (e) submitting and causing the submission of false and fraudulent claims to health care benefit programs, via interstate wire communications, for diagnostic cardiovascular tests that were medically unnecessary, ineligible for reimbursement, and not provided as represented in claims billed to health care benefit programs; (f) concealing the submission of false and fraudulent claims to health care benefit programs and the receipt of the fraud proceeds; and (g) diverting the fraud proceeds for the personal use and benefit of the defendant and his co-conspirators, and the use and benefit of others, and to further the conspiracy.

## Manner and Means

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

7

4.      **JASON FINKELSTEIN**, Co-Conspirator 1, Co-Conspirator 2, and others established, operated, and controlled Company 1, Cardiovascular Testing, and Cardiovascular Healthcare, purporting to provide no-cost cardiovascular testing services, including EKG, ECHO, and vascular ultrasound imaging tests, to screen student athletes for cardiac abnormalities associated with sudden cardiac arrest. **FINKELSTEIN**, Co-Conspirator 1, Co-Conspirator 2, and others falsified diagnoses for student athletes to defraud Commercial Insurance Plans, FEHBP, VHA, and Medicaid without conducting any clinical examination to determine whether the athletes had medical conditions or symptoms that warranted the testing. **FINKELSTEIN** approved these tests in some instances within seconds– such that student athletes with cardiac abnormalities were not informed that they needed to stop participating in sports, risking sudden cardiac arrest.

5.      Co-Conspirator 1, Co-Conspirator 2, and employees of Company 1 used marketing tactics to obtain access to student athletes with health insurance coverage. For example, Co-Conspirator 1 directed Company 1 employees to send emails to athletic trainers at colleges and universities stating, among other things, that the tests would "identify any life-threatening conditions common to athletes" at no cost to student athletes, when in fact the physician reviewing the cardiovascular tests did not conduct a meaningful review of the tests and rubber stamped the tests as "normal."

6.      Co-Conspirator 1 and Co-Conspirator 2 also offered kickbacks and bribes to athletic trainers, in the form of checks, wires, and gift cards, in exchange for the referral of their students for testing by Company 1. At certain schools, Co-Conspirator 1, Co-Conspirator 2, and athletic trainers informed student athletes that the testing was mandatory in order to play for their school's team.

8

7.      Sonographers employed by Company 1 traveled to college campuses across the United States to conduct the same panel of diagnostic cardiovascular testing, that is, the EKG, ECHO, and cardiovascular ultrasound billed to Commercial Insurance Plans, FEHBP, VHA, and Medicaid through **JASON FINKELSTEIN**'s companies, Cardiovascular Testing and Cardiovascular Healthcare. For almost all student athletes, sonographers conducted the same 6 tests. The claims to the Commercial Insurance Plans, FEHBP, VHA, and Medicaid falsely represented that **FINKLESTEIN** had referred the student athletes for the panel of diagnostic cardiovascular testing, even though he had met or examined the student athletes.

8.      Using an electronic platform, **JASON FINKELSTEIN** signed and approved the results of diagnostic cardiovascular tests conducted by Company 1 and billed to Commercial Insurance Plans, FEHBP, VHA, and Medicaid through Cardiovascular Testing and Cardiovascular Healthcare. **FINKELSTEIN** routinely approved tests within a few seconds of viewing them even though he knew, as he wrote to Co-Conspirator 1 in requesting malpractice coverage, that "[t]hese kids could be high risk . . . [o]ne of them drops dead on a field, they're coming after both of us." For example, on or about October 17, 2024, representatives of Company 1 conducted numerous cardiovascular tests on student athlete K.F. On or about October 26, 2024, **FINKELSTEIN** utilized an electronic medical records platform to access digital copies of the cardiovascular test results for K.F. This included approximately 63 images, some of which contained an "interpretation (unconfirmed)" noting potential cardiovascular abnormalities, including possible "right atrial hypertrophy" and "right ventricular hypertrophy" in the tests. Approximately eleven seconds after **FINKELSTEIN** accessed the 63 images of the cardiovascular tests for K.F., he signed all of them falsely stating that the results were "normal." After being informed of K.F.'s death and allegations from K.F.'s mother that **FINKELSTEIN's** medical clearance of K.F. had

9

led to his death, **FINKELSTEIN** continued to fraudulently sign cardiovascular tests as normal for other student athletes without reviewing them.

9.    **JASON FINKELSTEIN**, Co-Conspirator 1, Co-Conspirator 2, and others submitted and caused to be submitted claims to the Commercial Insurance Plans, FEHBP, VHA, and Medicaid, that included false diagnoses that made patients appear eligible for diagnostic cardiovascular testing, when the patients did not, in fact, have such diagnoses.

10.    **JASON FINKELSTEIN** was licensed in the 48 contiguous states, which enabled him and his co-conspirators to fraudulently submit claims for students from schools all over the United States. **FINKELSTEIN**, Co-Conspirator 1, Co-Conspirator 2, and others included and caused to be included place of service codes and other information in the claims submitted to the Commercial Insurance Plans, FEHBP, VHA, and Medicaid that falsely indicated that patients had undergone diagnostic cardiovascular testing at **FINKELSTEIN**'s office in Tarrant County, Texas, when, in fact, they had not.

11.    **JASON FINKELSTEIN**, Co-Conspirator 1, Co-Conspirator 2, and others included and caused to be included dates of service and other information in the claims submitted to the Commercial Insurance Plans, FEHBP, VHA, and Medicaid that falsely indicated that **FINKELSTEIN** had reviewed the results of the diagnostic cardiovascular testing conducted on patients, when, in fact, he had not. In or around August 2022, Co-Conspirator 2 texted **FINKELSTEIN** about an abdominal aorta ultrasound, which Company 1 routinely conducted on patients and billed to Commercial Insurance Plans, FEHBP, VHA, and Medicaid between in or around January 2020 and in or around January 2024. **FINKELSTEIN** replied to Co-Conspirator 2: "I don't read those." Co-Conspirator 2 replied to **FINKELSTEIN**: "Oh lol why do we do them." **FINKELSTEIN** replied to Co-Conspirator 2: "Exactly." After exchanging these text messages in

10

or around August 2022, **FINKELSTEIN**, Co-Conspirator 1, Co-Conspirator 2, and others continued to prepare and submit, and continued to cause to be prepared and submitted, false and fraudulent claims for abdominal aorta ultrasounds until in or around January 2024.

12.    **JASON FINKELSTEIN**, Co-Conspirator 1, Co-Conspirator 2, and others prepared and submitted, and caused to be prepared and submitted, false and fraudulent documentation to the Commercial Insurance Plans, FEHBP, VHA, and Medicaid on behalf of Cardiovascular Testing, Cardiovascular Healthcare, and Company 1 in order to appeal claims that the insurance companies had denied.

13.    **JASON FINKELSTEIN**, Co-Conspirator 1, and Co-Conspirator 2 sought to conceal and disguise the scheme, including by forming additional companies to circumvent efforts by the Commercial Insurance Plans, FEHBP, VHA, and Medicaid to prevent fraudulent billing, and submitting and causing to be submitted false and fraudulent claims for diagnostic cardiovascular testing conducted by Company 1 through Cardiovascular Testing and Cardiovascular Healthcare to conceal Co-Conspirator 1's involvement in the scheme.

14.    **JASON FINKELSTEIN**, Co-Conspirator 1, Co-Conspirator 2, and others submitted and caused the submission of more than $89 million in false and fraudulent claims to the Commercial Insurance Plans, FEHBP, VHA, and Medicaid via interstate wire communications for diagnostic cardiovascular testing that was medically unnecessary, ineligible for reimbursement, and not provided as billed. The Commercial Insurance Plans, FEHBP, VHA, and Medicaid paid more than $13.1 million based on these false and fraudulent claims to bank accounts in the name of Cardiovascular Testing and Cardiovascular Healthcare.

15.    Between in or around January 2019 and in or around December 2025, **JASON FINKELSTEIN** was paid a total of approximately $1.1 million from the reimbursements

11

Cardiovascular Testing, Cardiovascular Healthcare, and Company 1 received from the Commercial Insurance Plans, FEHBP, VHA, and Medicaid through checks and wires issued by Co-Conspirator 1 and Co-Conspirator 2.

16.    **JASON FINKELSTEIN** and his co-conspirators used the fraud proceeds received from the Commercial Insurance Plans, FEHBP, VHA, and Medicaid to benefit themselves and others, and to further the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2–4
### Health Care Fraud
### (18 U.S.C. § 1347)

1.    The General Allegations section of this Indictment and the allegations contained in paragraphs 1 through 16 of the Manner and Means section of Count 1 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.    From in or around January 2019, and continuing through in or around December 2025, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### JASON FINKELSTEIN,

in connection with the delivery of and payment of health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, the Commercial Insurance Plans, FEHBP, VHA, and Medicaid, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs.

### Purpose of the Scheme and Artifice

3.    It was a purpose of the scheme for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) obtaining patient referrals for medically

12

unnecessary diagnostic cardiovascular testing through marketing tactics designed to prey on fears that student athletes could die from sudden cardiac arrest and through the payment of kickbacks and bribes to athletic directors and others; (b) employing sonographers who lacked the requisite credentials to travel to school campuses to conduct the same panel of diagnostic cardiovascular tests on student athletes without any clinical examination or assessment being conducted by a doctor; (c) assigning false diagnosis codes to the students' completed medical questionnaires so that Company 1's billers could then use them to bill claims to health care benefit programs; (d) signing off on cardiovascular diagnostic tests as normal without conducting a meaningful medical review of the tests; (e) submitting and causing the submission of false and fraudulent claims to health care benefit programs, via interstate wire communications,  for diagnostic cardiovascular tests that were medically unnecessary, ineligible for reimbursement, and not provided as represented in claims billed to health care benefit programs; (f) concealing the submission of false and fraudulent claims to health care benefit programs and the receipt of the fraud proceeds; and (g) diverting the fraud proceeds for the personal use and benefit of the defendant and his co-conspirators, and the use and benefit of others, and to further the conspiracy.

### The Scheme and Artifice

4.    The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

### Acts in Execution of Attempted Execution of the Scheme and Artifice

5.      On or about the dates specified below as to each count, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**JASON FINKELSTEIN,**

did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud health care benefit programs, in that defendant caused the submission of fraudulent claims, and falsely and fraudulently represented that such services were medically necessary, eligible for reimbursement, and provided to patients as claimed, as set forth below:

| Count | Patient | Referring / Servicing / Rendering Provider | Approx. Claim Date | Claim No. | Services Billed Via Medical Billing Software Company 1 From Palm Beach County | Approx. Amount Billed |
|---|---|---|---|---|---|---|
| 2 | M.B. | **JASON FINKELSTEIN** | 10/04/2023 | ED4389 724401 | abdominal aorta ultrasound | $150 |
| 3 | J.H. | **JASON FINKELSTEIN** | 1/25/2024 | 7682402 611372 | abdominal aorta ultrasound | $150 |
| 4 | K.F. | **JASON FINKELSTEIN** | 10/23/2024 | ET3112 498401 | EKG, ECHO, vascular ultrasounds | $975 |

In violation of Title 18, United States Code, Sections 1347 and 2.

### FORFEITURE ALLEGATIONS
**(18 U.S.C. § 982(a)(7))**

1.      The allegations of this Indictment are hereby re-alleged and by this reference fully incorporated herein for alleging forfeiture to the United States of America of certain property in which the defendant has an interest.

14

2.      Upon conviction of a violation of Title 18, United States Code, Section 1349, or a violation of Title 18, United States Code, Section 1347, as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, pursuant to Title 18, United States Code, Section 982(a)(7).

3.      The property subject to forfeiture as a result of the alleged offenses includes, but is not limited to, a sum of approximately $13,146,886, which represents the total amount of funds derived from the alleged offenses, and may be sought as a forfeiture money judgment.

4.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   a.   cannot be located upon the exercise of due diligence;

   b.   has been transferred or sold to, or deposited with, a third party;

   c.   has been placed beyond the jurisdiction of the court;

   d.   has been substantially diminished in value; or

   e.   has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth

in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code,

Sections 982(b)(1) and 982(b)(2).

A TRUE BILL

FOREPERSON

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

LORINDA LARYEA, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

AISHA SCHAFER HYLTON
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

**CASE NO.** 26-CR-80123-CANNON/McCabe

v.

### CERTIFICATE OF TRIAL ATTORNEY

JASON FINKELSTEN,

_____ /
            Defendant.

**Court Division** (select one)
- ☐ Miami  ☐ Key West  ☐ FTP
- ☐ FTL  ☒ WPB

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total Number of New Counts _____

I do hereby certify that:

1. I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No
   List language and/or dialect:_____

4. This case will take ___7___ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   **(Check only one)**        **(Check only one)**
   - I ☐ 0 to 5 days     ☐ Petty
   - II ☒ 6 to 10 days    ☐ Minor
   - III ☐ 11 to 20 days   ☐ Misdemeanor
   - IV ☐ 21 to 60 days   ☒ Felony
   - V ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No._____

7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Judge _____ Magistrate Case No._____

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge _____ Case No._____

9. Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) No

13. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) No

14. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

15. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No

16. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? No

17. Did this matter involve the participation of or consultation with Magistrate Judge Yeney Hernandez during her tenure at the U.S. Attorney's Office, which concluded on April 2, 2026? No

By: _____
AISHA SCHAFER HYLTON
DOJ Trial Attorney
SDFL Court ID No. A5503133

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**PENALTY SHEET**

**Defendant's Name**: _____ **JASON FINKELSTEIN** _____

**Case No**: _____

Count #:    1

___ Title 18, United States Code, Section 1349 _____

___ Conspiracy to Commit Health Care Fraud and Wire Fraud _____
* **Max. Term of Imprisonment:    20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:   $250,000 or twice the gross grain or loss from the offense** _____

Counts #:   2 – 4

___ Title 18, United States Code, Section 1347 _____

___ Health Care Fraud _____
* **Max. Term of Imprisonment:    10 years as to each count**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:   3 years**
* **Max. Fine:    $250,000 or twice the gross grain or loss from the offense** _____

_____

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.**